**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | | |
|---|---|---|
| **NEXTEEL CO., LTD.,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Court No. 26-04697** |
| **UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**COMPLAINT**

Plaintiff, NEXTEEL Co., Ltd. ("Plaintiff" or "NEXTEEL"), by and through its counsel, hereby alleges and states as follows:

**JURISDICTION**

1. Plaintiff brings this action pursuant to 19 U.S.C. §§ 1516a(a)(2)(A)(i)(I) and (a)(2)(B)(iii) to contest certain aspects of the final results of the 2023–2024 administrative review of the antidumping duty order on *Certain Oil Country Tubular Goods from the Republic of Korea*, Case No. A-580-870, issued by the International Trade Administration of the U.S. Department of Commerce ("Commerce"). *See Certain Oil Country Tubular Goods From the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2023–2024*, 91 Fed. Reg. 60,583 (Sep. 24, 2026) ("*Final Results*"), and the accompanying unpublished Issues and Decision Memorandum ("Final IDM"); *see also Certain Oil Country Tubular Goods From the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2023–2024; Correction*, 91 Fed. Reg. 73,528 (Nov. 16, 2026) ("*Amended Final Results*").

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) because this appeal is taken pursuant to 19 U.S.C. § 1516a.

**STANDING**

3. Plaintiff, NEXTEEL, is a foreign producer and exporter of subject oil country tubular goods ("OCTG") from the Republic of Korea. NEXTEEL participated as a mandatory respondent in the proceeding before Commerce that resulted in the contested *Final Results*. Therefore, NEXTEEL is an interested party within the meaning of 19 U.S.C. § 1677(9)(A). Accordingly, NEXTEEL has standing to commence this action pursuant to 19 U.S.C. § 1516a(d) and 28 U.S.C. § 2631(c).

**TIMELINESS OF THE ACTION**

4. On September 24, 2026, Commerce published the *Final Results* in the Federal Register. *Final Results*, 91 Fed. Reg. 60,583. On October 22, 2026, NEXTEEL timely filed a Summons initiating this action within thirty days of the publication of the *Final Results*. *See* ECF No. 1. This Complaint is timely filed as the last day of the period to file a complaint under Rule 3(a)(2) fell on Saturday, November 21, 2026, and the next day that is not a Saturday, Sunday, or legal holiday is November 23, 2026. Accordingly, this action is timely filed under 19 U.S.C. § 1516a(a)(2)(A)(i)(II) and Rules 3(a)(2) and 6(a) of this Court.

**STATEMENT OF FACTS**

5. On October 17, 2024, Commerce initiated the 2023–2024 administrative review of the antidumping duty order on OCTG from Korea. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 89 Fed. Reg. 83,644 (Oct. 17, 2024). The period of review was September 1, 2023, through August 31, 2024. On December 5, 2024, Commerce selected NEXTEEL and SeAH Steel Corporation ("SeAH") as mandatory respondents.

6. On February 18, 2025, the domestic interested parties submitted a so-called "cost-based" particular market situation ("PMS") allegation. On May 5, 2025, Commerce accepted the domestic interested parties' PMS allegation and established deadlines for interested parties to submit factual information to rebut, clarify, or correct the information in the domestic interested parties' PMS. Following the receipt of the PMS allegation, Commerce issued the domestic interested parties multiple requests for additional information regarding the allegation. SeAH and NEXTEEL filed rebuttal information and comments concerning the PMS allegation and the domestic interested parties' supplemental submissions.

7. On June 4, 2025, Commerce invited interested parties to submit information for calculating constructed value ("CV") profit and selling expenses because NEXTEEL and SeAH had reported they lacked viable home or third-country markets. On June 13, 2025, NEXTEEL, SeAH, and the domestic interested parties submitted financial statements for multiple companies as potential sources. The domestic interested parties submitted Tenaris S.A.'s ("Tenaris") 2024 financial statements, and NEXTEEL and SeAH submitted financial statements for multiple companies, including Alleima, Borusan Birleşik Boru Fabrikaları Sanayi ve Ticaret Anonim Şirketi ("Borusan Boru"), and Voestalpine AG ("Voestalpine").

8. On March 16, 2026, Commerce published the *Preliminary Results* in the Federal Register. *See Certain Oil Country Tubular Goods Antidumping Duty Administrative Review;* 2023–2024, 91 Fed. Reg. 12,575 (Mar. 16, 2026) ("*Preliminary Results*"), and accompanying Preliminary Decision Memorandum ("Preliminary IDM"). Commerce preliminarily calculated weighted-average dumping margins of 0.00 percent for NEXTEEL and SeAH. In the *Preliminary Results*, Commerce found that a cost-based PMS affected Korean hot-rolled coil ("HRC"), an input used to produce OCTG, and applied a cost adjustment derived from the

domestic interested parties' regression model. Commerce also used the combined financial statements of Alleima, Borusan Boru, and Voestalpine to calculate a combined CV profit rate of 2.72 percent. *See* Preliminary IDM at 4, 15–17. Commerce found the three producers' profits from OCTG sales provided a reasonable proxy for profits on sales of comparable merchandise for consumption in Korea.

9. Following the *Preliminary Results*, on March 20, 2026, Commerce requested information on the variable cost of manufacturing HRC in the United States during the POR. On April 16, 2026, the domestic interested parties submitted U.S. hot-rolled band ("HRB") pricing data from SteelBenchmarker. On April 20, 2026, NEXTEEL and SeAH submitted rebuttal information. On June 11, 2026, Commerce issued its Post-Preliminary Analysis, in which it calculated the PMS adjustment using a price benchmark in place of the regression model. *See* Department Memorandum, "Post-Preliminary Analysis for the Administrative Review of the Antidumping Duty Order on Certain Oil Country Tubular Goods from the Republic of Korea; 2023–2024" (June 11, 2026) ("Post-Preliminary Analysis").

10. On June 25, 2026, interested parties, including NEXTEEL, submitted case briefs. NEXTEEL challenged Commerce's PMS finding, the decision to adjust NEXTEEL's reported HRC costs, and the reasonableness of the price-benchmark methodology. NEXTEEL also presented alternative methodologies in the event Commerce retained its PMS finding. In their case brief, the domestic interested parties urged Commerce to only use Tenaris 2024 financial statements to calculate CV profit and selling expenses. Interested parties, including NEXTEEL, submitted rebuttal briefs on July 7, 2026, and Commerce held a hearing on July 29, 2026.

11. On September 24, 2026, Commerce published the *Final Results*, which retained the cost-based PMS finding and calculated the adjustment using U.S. SteelBenchmarker HRB

pricing data. *See Final Results*, 91 Fed. Reg. at 60,583–84, and Final IDM at Cmt. 2. In the *Final Results*, Commerce also replaced the three preliminary financial sources with Tenaris' 2024 financial statements as the sole basis for calculating CV profit and selling expenses ratios for NEXTEEL and SeAH. Commerce found that Tenaris' 2024 financial statements better reflected OCTG sales and that Borusan Boru's 2024 annual report showed a negative profit ratio. *See* Final IDM at Cmt. 1.

12. Commerce published a weighted-average dumping margin of 29.94 percent for NEXTEEL. On October 22, 2026, NEXTEEL filed its Summons with this Court challenging the *Final Results*. On November 16, 2026, Commerce published an *Amended Final Results*, correcting NEXTEEL's final margin as 29.18 percent. *See Amended Final Results*, 91 Fed. Reg. 73,528.

## STATEMENT OF CLAIMS

13. The *Final Results* are unsupported by substantial record evidence and otherwise not in accordance with law in the following aspects:

## COUNT I

14. Paragraphs 1 through 13 of this Complaint are incorporated herein by reference.

15. Under 19 U.S.C. § 1677b(e) and 19 C.F.R. § 351.416(d)–(e), Commerce must establish that a particular circumstance or set of circumstances contributed to a distortion such that the cost of producing subject merchandise does not accurately reflect costs in the ordinary course of trade. The regulation's allowance for qualitative evidence does not relieve Commerce of its obligation to establish the distortion and its connection to the alleged circumstances.

16. Commerce inferred that Chinese steel overcapacity and allegedly low-priced Chinese HRC imports suppressed Korean HRC prices. Its reliance on China's global position,

historical import growth, and import volumes does not establish that Chinese HRC imports suppressed Korean HRC prices during the POR. Commerce's analysis did not account adequately for the decline in Chinese HRC import volumes from 2023 to 2024, comparable prices for Chinese HRC exports to other markets, record evidence on capacity utilization in Korea, and alternative explanations for Korean steel producers' financial performance.

17. Commerce's analysis also did not establish that alleged Korean government intervention contributed to a distortion during the POR. For example, a steel-industry task force discussed in the allegation was formed after the review period, and the record did not establish that export financing or low-carbon steel support suppressed Korean HRC costs during the review period. Commerce's reliance on the Korean Electric Power Corporation's losses and government ownership likewise did not establish that electricity rates distorted NEXTEEL's OCTG production costs.

18. The record and Commerce's analysis also did not establish "particularity," as required under 19 C.F.R. § 351.416(e). Global overcapacity and similar pricing across export markets did not establish a particular distortion affecting HRC in Korea. Commerce's reliance on Korea's import volumes and the timing of trade remedies did not adequately explain how these circumstances affected costs for the relevant producers or products during the review period.

19. The evidence, considered individually and cumulatively, does not support Commerce's finding of a cost-based PMS. Accordingly, Commerce's PMS finding is unsupported by substantial evidence and is therefore not in accordance with law under 19 U.S.C. § 1516a(b)(1)(B)(i).

**COUNT II**

20. Paragraphs 1 through 19 of this Complaint are incorporated herein by reference.

21. Even assuming a cost-based PMS existed, Commerce did not establish that NEXTEEL's actual HRC purchase costs fell outside the ordinary course of trade or required adjustment under 19 U.S.C. § 1677b(e) and 19 C.F.R. § 351.416(f). NEXTEEL purchased HRC from Korean producers at prices above the unit value of Chinese HRC imports into Korea. Its average HRC purchase price also exceeded the contemporaneous SteelBenchmarker world export HRB price. Commerce's assertion of market-wide price suppression did not adequately address that evidence.

22. Commerce lacked a reasonable basis to quantify any distortion to NEXTEEL's costs. On March 20, 2026, Commerce requested data on the variable cost of manufacturing HRC in the United States during the POR. The domestic interested parties did not supply those cost data and instead provided U.S. HRB sales prices from SteelBenchmarker. Commerce relied on those prices because NEXTEEL and SeAH buy HRC from outside suppliers and because it considered the U.S. market insulated from Chinese steel overcapacity. Neither rationale adequately explains why U.S. HRB sales prices represent the price NEXTEEL would have paid for HRC in Korea absent the alleged PMS, or why the difference between those U.S. prices and NEXTEEL's Korean purchase prices measures the distortion attributable to the alleged PMS. *See* Final IDM at Cmt. 2, pp. 18, 23–24.

23. In conducting its evaluation, Commerce also did not give reasoned consideration to NEXTEEL's revised regression analysis, which supported no adjustment, and to NEXTEEL's proposed alternative HRB benchmarks, including the world export series and the average of U.S. and European prices used in Commerce's antidumping investigation of corrosion-resistant steel from Taiwan. *See Certain Corrosion-Resistant Steel Products from Taiwan: Final Affirmative*

*Determination of Sales at Less Than Fair Value*, 90 Fed. Reg. 42,210 (Aug. 29, 2025), and accompanying Issues and Decision Memorandum at Cmt. 5, p. 20. On this record, Commerce should have made no adjustment under 19 C.F.R. § 351.416(f)(3). Any adjustment Commerce retained was required to rest on a reasonable methodology under 19 C.F.R. § 351.416(f)(2).

24. Commerce's decision to adjust NEXTEEL's costs, and its selection and application of the U.S.-only benchmark, are unsupported by substantial evidence on the record and otherwise not in accordance with law under 19 U.S.C. § 1516a(b)(1)(B)(i).

**COUNT III**

25. Paragraphs 1 through 24 of this Complaint are incorporated herein by reference.

26. In the *Preliminary Results*, Commerce used financial data from Alleima, Borusan Boru, and Voestalpine to calculate NEXTEEL's CV profit and selling expenses under 19 U.S.C. § 1677b(e)(2)(B)(iii). Commerce found that the three producers' OCTG profits provided a reasonable proxy for profits on sales of comparable merchandise for consumption in Korea and calculated a combined CV profit rate of 2.72 percent. *See* Preliminary IDM at 15–17. In the *Final Results*, Commerce replaced those three sources with Tenaris's 2024 financial statements as the sole source for NEXTEEL's CV profit and selling expenses ratios. *See* Final IDM at Cmt. 1.

27. Commerce unreasonably inferred that Tenaris' financial statements better reflected OCTG sales because its Tubes segment accounted for approximately 95 percent of its sales. *See* Final IDM at Cmt. 1. While it acknowledged that Tenaris's financial statements do not separately identify OCTG sales, Commerce nevertheless inferred that OCTG accounted for a significant share of Tenaris' revenue based on the size of the Tubes segment and Tenaris' descriptions of the importance of OCTG to that segment. The Tube segment also includes line

pipe, mechanical and structural tubes, and related services. Commerce's inference that Tenaris sold significant volumes of OCTG did not adequately explain why the consolidated profit and selling expense figures for those operations provide a more representative proxy than the combined data Commerce used in the *Preliminary Results*.

28. NEXTEEL presented comparative data showing that the profit rate the domestic interested parties calculated from Tenaris' 2024 financial statements exceeded the rates reported for other major OCTG producers, including Korean producers. Commerce found speculative the contention that product differentiation and technical services inflated Tenaris' profits, but did not explain why the disparity shown by the comparative data did not undermine Tenaris' suitability as the sole source of CV profit.

29. NEXTEEL also identified specific government assistance to Tenaris' production subsidiaries. Commerce's finding that the record did not establish receipt of subsidies it had previously found countervailable did not address whether the assistance identified by NEXTEEL affected the reliability of Tenaris' reported profit. Commerce also did not explain why the limitations it identified in the preliminary sources, including the negative profit ratio it derived from Borusan Boru's 2024 annual report, justified relying exclusively on Tenaris despite the limitations on Tenaris' own financial statements.

30. Accordingly, Commerce's selection of Tenaris' 2024 financial statements as the sole source of NEXTEEL's CV profit and selling expenses ratios was unreasonable under 19 U.S.C. § 1677b(e)(2)(B)(iii). That determination and the resulting calculation of NEXTEEL's weighted-average dumping margin are unsupported by substantial evidence on the record or otherwise not in accordance with law under 19 U.S.C. § 1516a(b)(1)(B)(i).

## REQUEST FOR RELIEF

For the foregoing reasons, NEXTEEL respectfully requests that this Court:

A. Hold unlawful Commerce's cost-based PMS finding and resulting adjustment as applied to NEXTEEL and Commerce's selection of Tenaris' 2024 financial statements as the sole source for calculating NEXTEEL's CV profit and selling expense ratios;

B. Remand the Final Results to Commerce with instructions to recalculate NEXTEEL's margin without the PMS adjustment or, if the Court sustains the PMS finding and permits an adjustment, to reconsider the adjustment and recalculate the margin using a lawful methodology supported by substantial evidence;

C. On remand, direct Commerce to redetermine NEXTEEL's CV profit and selling expense ratios using a lawful methodology supported by substantial evidence and recalculate NEXTEEL's weighted-average dumping margin accordingly;

D. Direct Commerce to issue revised assessment and cash deposit instructions, as applicable, consistent with the Court's final judgment; and

E. Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/ J. David Park
J. David Park
Henry D. Almond
Kang Woo Lee
Archana Rao Vasa
Sally Alghazali
Jennifer "Ellie" Farrin

*Counsel to NEXTEEL Co., Ltd.*
*Plaintiff*

ARNOLD & PORTER KAYE SCHOLER LLP
601 MASSACHUSETTS AVENUE, N.W.
WASHINGTON, D.C. 20001
PHONE: (202) 942-5646
FAX: (202) 942-5999

**Dated: November 23, 2026**